IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

ROBIN FINLEY,

  Plaintiff,

v.           CASE NO. 2:04-cv-00646

JO ANNE BARNHART,
Commissioner of Social Security,

  Defendant.

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This case was referred to this United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the court are cross-motions for judgment on the pleadings.

Plaintiff, Robin Bruce Finley (hereinafter referred to as "Claimant"), protectively filed an application for DIB on January 25, 2002, alleging disability as of September 7, 1996[1], due to a

_____

[1] Claimant had filed a previous application for DIB that was denied at the initial level of consideration on September 11, 1998. This denial was not appealed, and the ALJ declined to reopen this application. (Tr. at 13-14.) Thus, the relevant time period at issue in the current application begins September 11, 1998, and ends on December 31, 2001, the date Claimant's insured status expired.

right brachial plexis injury caused by a gunshot wound.  (Tr. at 188-90, 214.)   The claim was denied initially and upon reconsideration.  (Tr. at 172-175, 177-78.)   On November 5, 2002, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 179.)   The hearing was held on May 14, 2003, before the Honorable Theodore Burock.  (Tr. at 389-418.)   By decision dated February 11, 2004, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 13-26.)   The ALJ's decision became the final decision of the Commissioner on April 30, 2004, when the Appeals Council denied Claimant's request for review.  (Tr. at 5-7.)   On June 24, 2004, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520 (2004).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 404.1520(a).  The

2

first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 404.1520(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.   Id. § 404.1520(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.    Id. § 404.1520(d).  If it does, the claimant is found disabled and awarded benefits.   Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. § 404.1520(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.   Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2004).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy.  McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

3

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 15.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of a right shoulder impairment, high blood pressure, obesity and a combination of mental disorders including depression and post-traumatic stress syndrome ("PTSD"). (Tr. at 15.)   At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 15, 18.)  The ALJ then found that Claimant has a residual functional capacity for sedentary work, reduced by nonexertional limitations.  (Tr. at 15.)  As a result, Claimant cannot return to his past relevant work.  (Tr. at 23.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as sorter/grader/inspector and bench-table worker, which exist in significant numbers in the national economy.  (Tr. at 24.) On this basis, benefits were denied.  (Tr. at 24.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept
> as sufficient to support a particular
> conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less

4

> than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the
> case before a jury, then there is 'substantial
> evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting

Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)).

Additionally, the Commissioner, not the court, is charged with

resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d

1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not

abdicate their traditional functions; they cannot escape their duty

to scrutinize the record as a whole to determine whether the

conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d

396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the

Commissioner in this case is supported by substantial evidence.

Claimant's Background

Claimant was forty-two years old at the time of the

administrative hearing.  (Tr. at 395.)  Claimant graduated from

high school and took some general college courses and criminal

justice courses.  (Tr. at 397.)  In the past, he worked as an

emergency medical technician and as a deputy sheriff.  (Tr. at

413.)

The Medical Record

The court has reviewed all evidence of record, including the

medical evidence of record, and will briefly summarize it below.

Evidence Prior to Relevant Time Period

On September 7, 1996, Claimant, who was working as a deputy sheriff, was shot multiple times in the face, bilateral upper extremities and chest while responding to a domestic violence call. He was treated and discharged on September 12, 1996. (Tr. at 245-46.)

On September 16, 1996, Claimant was hospitalized again with complaints of pain in the right shoulder. The initial impression was right shoulder pain, possibly related to the right lower lobe infiltrate, but must rule out secondary to the gunshot wound involving the glenohumeral joint, status post shotgun wound to the upper thorax, face and arms and right lower lobe infiltrate, rule out hemothorax. (Tr. at 97.) Claimant was discharged on September 19, 1996, with a final diagnosis of pulmonary contusion, restrictive lung disease and hyperpyrexia. (Tr. at 93.)

On November 4, 1996, C.Y. Amores, M.D., a neurosurgeon, wrote that Claimant had a brachial plexus injury and was unable to raise the right shoulder beyond fifteen degrees. Dr. Amores recommended Claimant see a specialist. (Tr. at 298.)

The record includes a treatment note dated January 30, 1997, from Phillip D. Hylton, M.D. Dr. Hylton noted that Claimant underwent an EMG and nerve conduction studies of the right upper extremity, which were abnormal and consistent with right axillary nerve injury and patchy changes consistent with trunk injury to the

brachial plexus.  Dr. Hylton recommended brachial plexus exploration and that Claimant visit David Klein, M.D., a neurosurgeon specializing in traumatic brachial plexus injuries. (Tr. at 105.)

The record includes physical therapy treatment notes dated October 29, 1996, through May 20, 1997.  Claimant made excellent progress, but his progress eventually plateaued.  (Tr. at 106.)

The record includes treatment notes dated February 16, 1995, through April 8, 1998, from J. Timothy Kohari, D.O.  By letter dated November 26, 1997, Dr. Kohari noted that because of Claimant's brachial plexus injury, Claimant had been unable to work and continued to have chronic shoulder pain.  Dr. Kohari further reported that Claimant's injury also resulted in anxiety and depression.  He recommended a psychiatric evaluation.  (Tr. at 120.)  On January 22, 1998, Dr. Kohari noted Claimant had a flat affect and diagnosed chronic pain, brachial plexus injury and depression.  (Tr. at 119.)  On April 8, 1998, Dr. Kohari noted that Claimant had improved eye contact, abduction in the right shoulder to ninety degrees and no atrophy or spasms present.  He diagnosed brachial plexus injury, spastic right upper extremity, chronic pain and abnormal liver enzymes.  (Tr. at 118.)

The record includes treatment notes from a pain management center dated March 20, 1998, and May 19, 1998.  On May 19, 1998, Ahmet Ozturk, M.D. examined Claimant and found normal range of

motion and no pain in the left upper extremity.  Sensory examination was remarkable for hyperesthesia and hyperalgesia at the lateral aspect of the upper arm on the left side.  On the right side, Claimant had muscle weakness in the biceps and his hand grip was weak.  Sensory examination was significant for hyperesthesia and hyperalgesia at the lateral aspect of the upper arm.  (Tr. at 134.)  Biceps and brachial radialis were absent, and triceps were diminished.  Dr. Ozturk's impression was brachial plexopathy, bilateral, right worse than left with involvement of C5 nerve root in particular and myofascial pain syndrome, neck and shoulders. (Tr. at 134.)  Dr. Ozturk recommended trigger point injections. (Tr. at 135.)

John B. Koch, M.A. examined Claimant on June 17, 1998, at the request of the State disability determination service.  Claimant's eye contact was good, and he was socially appropriate.  Claimant's affect during testing was constricted, though he smiled a few times.  (Tr. at 142.)  Claimant's thought processes appeared logical.  Claimant's short-term memory was good, his long-term memory was unimpaired.  Concentration was normal.  On the WAIS-R, Claimant attained a verbal IQ score of 83, a performance IQ score of 80 and a full scale IQ score of 81.  (Tr. at 143.)  Claimant's subjective symptoms included poor sleep and low energy.  Claimant reported a phobia about people shooting him and that he had nightmares about the shooting in 1996.  Mr. Koch's objective

8

findings were largely normal, except he noted some overall slowing of activity level. He diagnosed post-traumatic stress disorder/provisional, sleep disorder due to a general medical condition and borderline intellectual functioning. (Tr. at 144.) Regarding daily activities, Claimant reported he does light house cleaning, cooking and laundry. Claimant does not do yard work. Claimant did not visit with others or engage in other social activities. (Tr. at 145.)

A ventilatory function report form on July 21, 1998, was normal. (Tr. at 146.)

A State agency medical source completed a Physical Residual Functional Capacity Assessment on September 2, 1998, and opined that Claimant was limited to light work, reduced by an occasional ability to climb, limited reaching in all directions and handling and a need to avoid hazards. (Tr. at 150-56.)

A State agency medical source completed a Psychiatric Review Technique form on September 3, 1998, and opined that Claimant's mental impairments were not severe. (Tr. at 157-65.)

Evidence from Relevant Time Period

The evidence of record includes additional treatment notes from Dr. Kohari dated August 3, 1999, December 14, 1999, April 26, 2000, August 4, 2000, November 7, 2000, September 20, 2001, and October 19, 2001. (Tr. at 300-06, 384.) On August 3, 1999, Dr. Kohari noted a flat affect and that Claimant was obese. Dr. Kohari

9

noted that Claimant was to see a psychiatrist and was having bad dreams and difficulty sleeping. Claimant had abduction in the right shoulder to ninety degrees. His grip was diminished in the right hand due to pain. Dr. Kohari diagnosed intractable pain and a brachial plexus injury. (Tr. at 305.) On December 14, 1999, Dr. Kohari noted that psychiatric treatment was discontinued after a psychiatric evaluation. He noted a flat affect, but that Claimant laughed. He diagnosed chronic pain syndrome, depression and post traumatic stress disorder. Claimant was enrolled in electrical classes at Vo-tech. (Tr. at 306.) On April 26, 2000, Claimant reported he wanted to return to work as an arson investigator. He had a flat affect and poor eye contact. Claimant's hands were puffy but symmetrical. Dr. Kohari diagnosed chronic pain, brachial plexus injury and hypertension. (Tr. at 304.) On August 4, 2000, Dr. Kohari noted a flat affect, but that Claimant had improved emotionally. Claimant's abduction in the right shoulder was eight-five to ninety degrees. Dr. Kohari diagnosed chronic pain, brachial plexus injury and hypertension. (Tr. at 303.) On November 7, 2000, Dr. Kohari noted good eye contact. He diagnosed chronic pain, brachial plexus injury, hypertension and obesity. (Tr. at 302.) On September 20, 2001, Dr. Kohari recommended pain management. (Tr. at 301.) Claimant was uncomfortable and had poor eye contact. Claimant reported that he felt like killing himself because of the pain, but denied being suicidal. Dr. Kohari

10

diagnosed brachial plexus injury, intractable pain, hypertension and diabetes.  (Tr. at 300.)

Chest x-rays on July 28, 1999, showed right basal infiltrate with right pleural effusion and right basal atelectasis and cardiac prominence.  (Tr. at 311.)

The record includes additional physical therapy notes dated March 31, 1999, through July 30, 1999.  (Tr. at 337-44.)

Evidence After Relevant Time Period

On June 11, 2002, Mark Burns, M.D. examined Claimant at the request of the State disability determination service.  Examination of the shoulder joint was normal, Claimant had normal adduction and external rotation.  Claimant had normal supination and pronation zero to eighty degrees bilaterally.  Claimant had normal gross manipulation and grip strength and normal upper extremity strength. (Tr. at 315.)  The neurological examination was normal.  Dr. Burns opined that Claimant has the ability to perform activities involving sitting, standing, moving about, lifting, carrying, handling objects, hearing, seeing, speaking and traveling.  Despite pain in performing the shoulder maneuvers, Claimant was able to perform them and demonstrated no focal or neurological deficits. (Tr. at 316.)

On September 30, 2002, Dr. Kohari completed a form in connection with Claimant's claim for benefits from the State employee's retirement board.  Dr. Kohari stated that he last

examined Claimant on September 20, 2001, and that he was totally and permanently disabled.  (Tr. at 365.)

On October 23, 2002, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work, reduced by limitations in reaching in all directions.  (Tr. at 320-26.)

On January 2, 2003, Dr. Kohari completed a West Virginia Department of Health and Human Resources, General Physical (Adults).  He noted weak grip in the right hand and slight atrophy of the right deltoid.  Claimant had a dull affect and poor eye contact and effusion in the left knee.  (Tr. at 363.)  Dr. Kohari noted Claimant's diagnoses of hypertension, major depression, brachial plexis injury and chronic pain syndrome.  He opined that Claimant could not work full time in his customary occupation or other full time work.  He felt that Claimant should avoid sitting or any job requiring repetitive hand movements.  (Tr. at 364.)

On February 20, 2003, Carl R. Shelton, M.D. examined Claimant in connection with Claimant's claim for benefits from the State employee's retirement board.  Claimant had no tenderness in the shoulders or neck.  His active range of motion of the upper extremities was limited especially with external rotation, which was significantly decreased on the right compared with the left upper extremity.  He had good strength in both upper extremities, except in the right grip.  Sensation was intact in both upper

extremities.  There was no loss of muscle bulk.  Dr. Shelton opined that Claimant had residual deficits from his shotgun injury related to function and strength in the right upper extremity.  He also found evidence of depression, anxiety, post-traumatic stress disorder and morbid obesity.  As a result, he opined that Claimant was permanently disabled.  (Tr. at 369.)

On March 17, 2003, Robin Browning, M.A. examined Claimant at the request of the State Department of Health and Human Resources in connection with Claimant's application for State benefits. Claimant reported daily depression, crying spells, lack of energy and no interest in activities.  (Tr. at 355-56.)  Claimant's mood was depressed and his affect was constricted and flat.  Claimant's short and long-term memory were intact.  Attention and concentration were commensurate with his intelligence. Psychomotor activity was within normal limits.  Judgment and insight appeared adequate.  (Tr. at 357.)  On the WAIS-III, Claimant attained a full scale IQ score of 85, a verbal IQ score of 80 and a performance IQ score of 92.  (Tr. at 358.)  Ms. Browning administered a number of other tests, and diagnosed post-traumatic stress disorder, major depression, single, severe with psychotic features on Axis I and deferred an Axis II diagnosis.  She rated Claimant's GAF at 60. Ms. Browning concluded that Claimant required psychiatric treatment to improve his level of functioning and to address emotional difficulties.  In addition, she noted that Claimant needed

assistance in obtaining high blood pressure medication. She
concluded that a medical card would assist him in these tasks.
(Tr. at 361.)

On April 14, 2003, Ms. Browning completed a Medical Assessment
of Ability to do Work-Related Activities (Mental). She opined that
Claimant had a good ability to follow work rules, a fair ability to
use judgment, interact with supervisors, function independently,
maintain attention and concentration, understand, remember and
carry out detailed and simple job instructions, maintain personal
appearance and demonstrate reliability. She opined that Claimant
had a poor ability to relate to co-workers, use judgment, deal with
work stresses, understand, remember and carry out complex job
instructions, behave in an emotionally stable manner and relate
predictably in social situations. (Tr. at 328-29.)

Finally, the record includes additional treatment notes from
Dr. Kohari dated August 29, 2002, September 25, 2002, January 2,
2003, February 25, 2003, March 10, 2003, and March 24, 2003. (Tr.
at 376-83.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not
supported by substantial evidence because (1) the ALJ did not
properly consider Claimant's mental impairment and the opinion of
Ms. Browning related thereto; and (2) the ALJ's findings related to
Claimant's physical impairments are not supported by substantial

14

evidence.  (Pl.'s Br. at 8-13.)

    The Commissioner argues that (1) the ALJ complied with the
Commissioner's regulations in evaluating Claimant's functional
abilities; (2) the ALJ afforded proper weight to the opinion of Ms.
Browning; and (3) the ALJ complied with the Commissioner's
regulations in determining Claimant's residual functional capacity.
(Def.'s Br. at 9-15.)

    Claimant first argues that the ALJ erred in the weight
afforded the opinions of Ms. Browning.  Claimant notes that when
limitations opined by Ms. Browning were included in a hypothetical
question, the vocational expert could identify no jobs.  (Tr. at
415.)  Claimant argues that the only other source of record who
examined Claimant, Mr. Koch, examined him five years prior to Ms.
Browning's examination.  Claimant argues that Ms. Browning's
examination was more recent and closer in time to the expiration of
Claimant's insured status, and, therefore, more relevant.  Claimant
argues that Ms. Browning's diagnosis was consistent with the
limitations found by her.  Claimant asserts that the ALJ improperly
substituted his own opinion in rejecting Ms. Browning's opinion.
(Pl.'s Br. at 8-11.)

    In his decision, the ALJ determined that Claimant suffered
from a combination of severe mental impairments, including
depression and post-traumatic stress syndrome.  (Tr. at 15.)  The
ALJ acknowledged Claimant's subjective complaints related to his

15

mental impairments.  (Tr. at 19.)  The ALJ acknowledged the evidence of record during the relevant time period from September 11, 1998, through December 31, 2001.  He noted that Claimant had received outpatient mental health treatment, including medication, for a brief period of time from August to December of 1999, but that it ended when workers' compensation withdrew authorization following a psychiatric evaluation.  As the ALJ indicated in his decision, Claimant did not submit these records.  The ALJ went on to acknowledge that the only other evidence from the relevant time period related to Claimant's mental condition came from Dr. Kohari. The ALJ observed that Dr. Kohari noted complaints of nightmares and flashbacks of the shooting at one August 1999, visit and that he noted flat affect and/or poor eye contact at five of six visits during the relevant time period.  He noted Dr. Kohari's diagnoses of depression on three occasions and post-traumatic stress disorder with depression on one occasion.  (Tr. at 19.)  The ALJ observed that Dr. Kohari's treatment notes do not contain "any more elaborate observations about the claimant's symptoms and functional limitations than noted above (Exhibits 3F and 13F)."  (Tr. at 20.) In addition, the ALJ noted that Claimant had not sought mental health treatment, and that it did not appear that Dr. Kohari prescribed medication or referred Claimant for psychiatric counseling during the relevant time period, though he had since recommended it.  (Tr. at 20.)

The ALJ acknowledged that evidence before and after the relevant time period also supported ongoing symptoms of depression and post-traumatic stress syndrome.  He noted the results of Mr. Koch's examination in June of 1998, and the examination by Ms. Browning in March of 2003.  (Tr. at 20.)  However, the ALJ went on to find that "[t]he psychological evaluations before and after the relevant time period did not reveal evidence of significantly more severe symptoms, which might reflect upon the severity of the claimant's mental impairments in the interim."  (Tr. at 20.)

Regarding the opinions of Ms. Browning in particular, the ALJ determined that her opinions on the Medical Assessment of Ability to do Work-Related Activities (Mental) were not fully supported by her own clinical and laboratory findings.  The ALJ noted that Claimant's mental status examination was unremarkable, except for a depressed mood and a flat, constricted affect.  The ALJ further noted that Ms. Browning rejected Claimant's scores on the MMPI-2, expressing concern about exaggerated symptoms for secondary gain. The ALJ noted that Ms. Browning rated Claimant's GAF at 60, evidencing moderate, bordering on mild symptoms.  In addition, he explained that Ms. Browning

> assessed "poor" (that is, seriously limited) abilities to relate to coworkers and deal with the public, despite having observed "fair" social judgment during the mental status examination and having concluded that the claimant had "no problems with the adaptive behaviors" measured by the Adaptive Behavioral Scale-Residential and Community ("ABS") and that his "ability to ... communicate with others or integrate into the mainstream of society is

appropriate and without impairment" (Exhibits 7F, p. 1, and 9F, pp. 6, 9). Ms. Browning's assessment is compromised by the possibility that she was influenced by concern over the claimant's being "financially stressed" and needing assistance paying for medical care (Exhibit 9F, p. 10).

(Tr. at 19-20.)

The ALJ went on to observe that Mr. Koch examined Claimant in June of 1998, closer in time to the relevant time period, and observed a normal mental status examination, except for a somewhat constricted affect and an overall slowing of activity level. (Tr. at 21.)

The ALJ concluded that Claimant's mental impairments impacted his residual functional capacity in that he was limited to performing routine, repetitive tasks, could not perform detailed or complex tasks, as would be required in skilled labor, and could not perform any work activity involving public contact. (Tr. at 25.)

The court proposes that the presiding District Judge find that substantial evidence supports the ALJ's weighing of the evidence of record related to Claimant's mental condition, particularly that from Ms. Browning. The ALJ fully explained his findings related to Ms. Browning, and they are supported by substantial evidence and in keeping with the applicable regulation. 20 C.F.R. § 404.1527(d)(3), (4), and (5) (2004) (medical opinions should be considered using the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more

consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty)).

Contrary to Claimant's assertions, the ALJ's conclusion that Mr. Koch's report was prepared closer in time to the expiration of Claimant's insured status is accurate. Mr. Koch examined Claimant in June of 1998, three months before the relevant time period began. Ms. Browning examined Claimant in March of 2003, more than a year after Claimant's insured status expired on December 31, 2001. The ALJ's decision to rely more on the opinion of Mr. Koch was reasonable given the timing of that examination in relation to the expiration of Claimant's insured status and the fact that it was consistent with the remaining substantial evidence of record.

Indeed, as the ALJ indicated in his decision, during the relevant time period, the only evidence of record related to Claimant's mental condition comes from very brief notations in Dr. Kohari's treatment notes. As the ALJ stated in his decision, Claimant had not sought ongoing mental health treatment and, during the relevant time period, Dr. Kohari never prescribed medication or counseling or referred Claimant for a psychiatric evaluation. Instead, it was not until August of 2002, after Claimant's insured status expired, that Claimant requested referral to a psychologist, and Dr. Kohari did recommend a psychiatric evaluation in a letter

dated January of 2003.  (Tr. at 20.)

Based on the above, the court proposes that the presiding District Judge find that the ALJ properly weighed the evidence of record from Ms. Browning and that his findings related to Claimant's mental impairments and their resulting limitations are supported by substantial evidence.

Next, Claimant argues that substantial evidence does not support the ALJ's determination that Claimant can perform sedentary work.  Claimant argues that the ALJ erred in rejecting the opinion of his treating physician, Dr. Kohari, that Claimant was disabled by his shoulder injury and the opinion of Dr. Shelton, a consultative examiner, who also opined that Claimant was disabled. (Pl.'s Br. at 11-13.)

The court proposes that the presiding District Judge find that the ALJ properly weighed the opinions of Dr. Kohari and Dr. Shelton in keeping with applicable regulations and case law.  Id.; Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996) (A treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence.").

In his decision, the ALJ explained that he afforded little weight to the September 2002, opinion of Dr. Kohari that Claimant was disabled because it "is otherwise unsupported by any clinical

or laboratory findings or rationale.  As discussed previously, Dr. Kohari's treatment record does not provide medical evidence of signs and symptoms of disabling severity." (Tr. at 22.)  Regarding Dr. Kohari's opinion in January of 2003 that Claimant was unable to perform full-time work, the ALJ afforded this opinion little weight for the following reasons: (1) the passage of time since the date last insured; (2) limited restriction related to Claimant's right shoulder impairment; (3) the consideration of Claimant's recently developed knee impairment; (4) the consideration of depression as a major impairment despite the lack of any psychologically-based limitations in the record; and (5) the purpose of this evaluation, which was to obtain State assistance.  (Tr. at 22.)

Regarding Dr. Shelton's opinion to the State employee's retirement board, the ALJ also found that his opinion was not supported by clinical findings.  The ALJ explained that Dr. Shelton "relied on the claimant's self-reported medical history and psychological symptoms, and he did not identify the functional limitations secondary to hypertension and morbid obesity." (Tr. at 22.)  The ALJ observed that "[i]n contrast, the consultative medical examiner Dr. Burns, based on an examination closer to the date last insured, concluded that the claimant had the ability to perform basic physical work activities." (Tr. at 22.)

The ALJ's reasons for the weight afforded the opinion of Claimant's treating physician, Dr. Kohari, and the one time

21

consultative examiner, Dr. Shelton, who examined Claimant well after the expiration of Claimant's insured status, are well reasoned and supported by substantial evidence and, the court proposes that the presiding District Judge so find.

Finally, Claimant argues that the ALJ did not address his pulmonary problems as diagnosed by Dr. Younes and, more recently, in a 1999 x-ray that revealed a right basal infiltrate with right plural effusion and right basal atelectasis. (Pl.'s Br. at 12-13.)

Claimant did not describe breathing impairments of any kind at the administrative hearing.  While Claimant's gunshot wounds in 1996 resulted in pulmonary contusion, restrictive lung disease and hyperpyrexia, there is no indication that Claimant was functionally limited by a breathing impairment during the relevant time period. Dr. Kohari consistently found Claimant's lungs to be clear during the relevant time period, and never diagnosed a pulmonary impairment of any kind.  (Tr. at 300-06.)  On July 21, 1998, Claimant had a normal ventilatory function study.  (Tr. at 146.) Likewise, Dr. Burns noted in his consultative examination of June 11, 2002, that Claimant's chest was clear to auscultation in all lobes with no rales, rhonchi or wheezing.  (Tr. at 315.)  Thus, the court proposes that the presiding District Judge find that the ALJ adequately considered Claimant's pulmonary impairments and did not err in failing to find such an impairment severe.

For the reasons set forth above, it is hereby respectfully

22

RECOMMENDED that the presiding District Judge DENY the Plaintiff's Motion for Judgment on the Pleadings, GRANT the Defendant's Motion for Judgment on the Pleadings, AFFIRM the final decision of the Commissioner and DISMISS this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable Robert C. Chambers.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then ten days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Chambers, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to counsel of record.

_June 15, 2005_
Date

*Mary E. Stanley*
Mary E. Stanley
United States Magistrate Judge